1   SEYFARTH SHAW LLP
    Mariana Aguilar (SBN 208726)
2   2029 Century Park East, Suite 3500
    Los Angeles, California  90067-3021
3   Telephone:  (310) 277-7200
    Facsimile:  (310) 201-5219
4   maguilar@seyfarth.com

5   SEYFARTH SHAW LLP
    Noah A. Finkel (admitted *pro hac vice*)
6   Arthur J. Rooney (admitted *pro hac vice*)
    131 South Dearborn Street, Suite 2400
7   Chicago, Illinois  60603
    Telephone:  (312) 460-5000
8   Facsimile:  (312) 460-7000
    nfinkel@seyfarth.com
9   arooney@seyfarth.com

10  Attorneys for Defendant
    GC SERVICES, LP
11

12

13                  UNITED STATES DISTRICT COURT

14               SOUTHERN DISTRICT OF CALIFORNIA

15  BROOKE GARDNER, on behalf of herself and )   Case No. 3:10-cv-00997-IEG-CAB
    all others similarly situated,            )
16                                            )   **MEMORANDUM OF POINTS AND**
                    Plaintiff,                )   **AUTHORITIES IN OPPOSITION TO**
17                                            )   **PLAINTIFF'S RULE 23 MOTION FOR**
         v.                                   )   **CLASS CERTIFICATION**
18                                            )
    GC SERVICES, LP,                          )   Date:  March 21, 2011
19                                            )   Time:  10:30 a.m.
                    Defendant.                )   Judge:  Hon. Irma E. Gonzalez
20  _____   )   Courtroom:  1

21

22

23

24

25

26

27

28

13117824v.3

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................2

I.      GC Services Offers A Variety Of Services In California ..................................2

II.     GC Services' Timekeeping Polices Prohibit Unpaid Work............................3

        A.      GC Services Instructs Its Employees To Report All Time Worked, Including Time Spent Logging In To Any Work Systems ....................3

        B.      GC Services Enforces Its Timekeeping Policies In Several Ways .........4

III.    Account Representatives Record Their Hours Electronically ............................5

IV.    When Account Representatives Are Allowed To Clock In To The Timekeeping System And Begin Working Varies...........................................6

V.     Account Representatives Are Not Required To Work Before Their Scheduled Shift..................................................................................................7

ARGUMENT ......................................................................................................................8

I.      Standard For Class Certification ....................................................................8

        A.      Rule 23 Requires A Rigorous Analysis Of The Propriety Of Trying This Case As A Class Action .............................................................8

        B.      The Mere Fact That Another Court Certified An FLSA Collective Action, Under An Entirely Different ─And More Lenient ─ Standard Does Not Support Rule 23 Class Certification Here................................................9

        C.      Plaintiff Cannot Satisfy Her Burden Simply By Pointing To The Certification Of Other Wage And Hour Class Actions .........................10

II.     Plaintiff's Proposed Class Cannot Satisfy Rule 23(a) ..................................11

        A.      There Are No Questions Of Law Or Fact Common To The Class That Will Advance The Litigation ...............................................................11

              1.      GC Services does not have a policy that prohibits account representatives from recording all hours worked........................12

              2.      GC Services' bonus system does not incentivize unpaid work ................13

               3.      Plaintiff's declarations do not identify a single unlawful plan or policy...................................................................................14

               4.      Declarations submitted by GC Services show significant differences among the potential class members........................17

               5.      An analysis of the walk-in, clock-in, and log-in times demonstrates that Gardner's claims are not common to the putative class ..................18

i

B.    Plaintiff's Claims Are Not Typical Of The Putative Class.....................................19

C.    Plaintiff Is Not An Adequate Class Representative...............................................20

III.   Plaintiff's Proposed Class Cannot Satisfy Rule 23(b)(3) ...........................................21

A.    Individual Questions Will Eclipse Any Common Ones ......................................21

B.    Class Treatment Is Not A Superior Method Of Resolving This Controversy.................................................................................................................24

IV.   Plaintiff Is Not Entitled To The Telephone Numbers And Social Security Numbers of GC Services' Current And Former Employees ...............................................25

CONCLUSION....................................................................................................................25

OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

13117824v.3

# <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Amchem  Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)........................................................................................................21

*Beasley v. GC Services*,
    270 F.R.D. 442 (E.D. Mo. 2010) ..................................................................................10

*Bishop v. Petro-Chem. Transp., LLC*,
    582 F. Supp. 2d 1290 (E.D. Cal. 2008).........................................................................11

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983).........................................................................................................21

*Clesceri v. Beach City Investigations & Protective Servs., Inc.*,
    No. CV-10-3873, 2011 WL 320998 (C.D. Cal. Jan. 27, 2011) ......................................9

*Delgado v. Ortho-McNeil, Inc.*,
    No. 07-263, 2007 WL 2847238 (C.D. Cal. Aug. 7, 2007) ............................................25

*Does v. District of Columbia*,
    216 F.R.D. (D. D.C. 2003)............................................................................................21

*Dukes v. Wal-Mart*,
    509 F.3d 1168 (9th Cir. 2007) ......................................................................................10

*Garcia v. Sun Pac. Farming Coop.*,
    No. 06-0871, 2008 WL 2073979 (E.D. Cal. May 14, 2008) ........................................ *passim*

*Gen. Tel. Co. v. Falcon*,
    457 U.S. 147 (1982).......................................................................................................11

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ........................................................................................19

*Hill v. R+L Carriers, Inc.*,
    690 F. Supp. 2d 1009 (N.D. Cal. 2010) ..........................................................................9

*Howard v. Gap, Inc.*,
    No. C 06-06773, 2009 WL 3571984 (N.D. Cal., Oct. 29, 2009)...................................12

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008)............................................................................................2

*In re Peregrine Sys., Inc. Sec. Litig.*,
    No. 02 CV 870-J(RBB), 2002 WL 32769239 (S.D. Cal. Oct. 11, 2002) ......................14

iii

*In re Wal-Mart Wage & Hour Emp't Litig.*,
No. 2:06-CV-00225, 2008 WL 3179315 (D. Nev. June 20, 2008) .......................................23

*Jiminez v. Domino's Pizza, Inc.*,
238 F.R.D. 241 (C.D. Cal. 2006) .........................................................................................9

*Johnson v. Ariz. Hosp. & Healthcare Ass'n*,
No. 07-1292, 2009 WL 5031334 (D. Ariz. July 13, 2009).....................................................2

*Koike v. Starbucks Corp.*,
No. C 06-3215, 2008 WL 7796650 (N.D. Cal. June 20, 2008)
aff'd, 378 Fed. Appx. 659, 2010 WL 1784727 (9th Cir. May 5, 2010) ...........................10, 23

*Littlefield v. Dealer Warranty Servs., LLC*,
679 F. Supp. 2d 1014 (E.D. Mo. 2010)...........................................................................11, 25

*Mateo v. V.F. Corp.*,
No. 08-5313, 2009 WL 3561539 (N.D. Cal. Oct. 27, 2009) ........................................10, 20, 24

*McPhail v. First Command Fin. Planning, Inc.*
247 F.R.D. 598 (S.D. Cal. 2007) .......................................................................................1, 8

*Norris-Wilson v. Delta-T Group, Inc.*,
No. 09-0916, 2010 WL 2196066 (S.D. Cal. June 1, 2010) .....................................................9

*Rutledge v. Elec. Hose & Rubber Co.*,
511 F.2d 668 (9th Cir. 1975) .............................................................................................8

*Salazar v. Avis Budget Group, Inc.*,
251 F.R.D. 529 (S.D. Cal. 2008) .......................................................................................22

*Saleen v. Waste Mgmt., Inc.*,
No. 08-4959, 2009 WL 1664451 (D. Minn. June 15, 2009).................................................15

*Sarviss v. Gen. Dynamics Info. Tech. Inc.*,
663 F. Supp. 2d 883 (C.D. Cal. 2009) ................................................................................14

*Slayton v. Iowa Coll. Acquisition Corp.*,
No. 09 C 6977, 2010 WL 3937455 (N.D. Ill. Oct. 5, 2010)..................................................20

*Spainhower v. U.S. Bank Nat'l Ass'n*,
Nos. 08-137 & 08-645, 2010 WL 1408105 (C.D. Cal. Mar. 25, 2010)..................................10

*Smith v. T-Mobile USA, Inc.*, No.
CV 05-5274 ABC (SSx), 2007 WL 2385131 (C.D. Cal. Aug. 15, 2007) ...............................23

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) ...........................................................................................12

iv

13117824v.3

*Stevens v. Harper*,
    213 F.R.D. 358 (E.D. Cal. 2002) ............................................................................23

*Stiller v. Costco*,
    No. 09-cv-2473, 2010 WL 5597272 (S.D. Cal. Dec. 13, 2010) ..............................21

*Thompson v. Speedway SuperAmerica LLC*,
    No. 08-cv-1107, 2009 WL 130069 (D. Minn. Jan. 20, 2009) .................................15

*Velasquez v. HSBC Fin. Corp.*,
    266 F.R.D. 424 (N.D. Cal. 2010)......................................................................15, 23

*Vinole v. Countrywide Home Loans, Inc.*,
    571 F.3d 935 (9th Cir. 2009) ..................................................................................20

*Washington v. Joe's Crab Shack*,
    No. C 08-5551, 2010 WL 5396041 (N.D. Cal. Dec. 23, 2010).................................10, 11, 24

*Wilson v. Kiewit Pac. Co.*,
    No. 09-03630, 2010 WL 5059522 (N.D. Cal. Dec. 6, 2010)...................................15

*Zinser v. Accufix Research Inst.*,
    253 F.3d 1180 (9th Cir. 2001) ..............................................................................9, 24

**STATE CASES**

*Dunbar v. Albertson's, Inc.*,
    47 Cal. Rptr. 3d 83 (2006) .....................................................................................15

**INTRODUCTION**

GC Services Limited Partnership ("GC Services") has a strong and consistent policy requiring employees to clock in before beginning work and paying employees for all time worked.  Plaintiff Brooke Gardner, a former account representative of GC Services, however, complains that she occasionally did not record time that she spent working before and after her shift and during her meal breaks, and that an unidentified person sometimes altered her timesheets.  On the basis of her highly individualized complaints of isolated incidents of working "off the clock," Gardner seeks to certify a class of more than 1,400 current and former telephone-dedicated employees of GC Services in California.  Even if true, her allegations of isolated and infrequent incidents of working without compensation fail to satisfy her burden of establishing the prerequisites for class certification.

Though it is her burden to show that this case is manageable and suited for class treatment, *McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 608 (S.D. Cal. 2007), Gardner does not take her burden seriously.  Instead, she offers only her own superficial declaration and two conclusory declarations that do nothing to satisfy the rigorous requirements of Rule 23.  Nothing about Gardner's sparse evidence demonstrates that Gardner and the proposed class were subject to a common policy or practice that required them to work off the clock.  Nor has her evidence withstood scrutiny through cross-examination.  Since filing her motion, Gardner and her witnesses have recanted many of the claims they made in their declarations or, at the very least, contradicted them.  This testimony reveals that the alleged experiences of Gardner and her own witnesses are markedly different.  And the evidence GC Services submits with this memorandum clearly shows that GC Services did not engage in the unlawful standardized conduct towards members of the proposed class that Gardner alleges.

The inherent individualized nature of Gardner's allegations undermines any benefit of trying this case as a class action.  Because Gardner and every other putative class member was or is paid based on the time they themselves record, and because there is absolutely no evidence of a common policy or practice resulting in the unlawful failure to pay for time worked, questions of law or fact are not common and cannot predominate in any trial of these claims.  Whether any

1

1   particular class member was somehow discouraged from recording all of his or her time, or was

2   not paid for time that he or she recorded, would require individual proof.  "If proof of the

3   essential elements of the cause of action requires individual treatment, then class certification is

4   unsuitable."  *Johnson v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-1292, 2009 WL 5031334, at *7

5   (D. Ariz. July 13, 2009) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307

6   (3d Cir. 2008)).

7         Accordingly, Gardner's motion for class certification should be denied.

8                                    **<u>BACKGROUND</u>**

9   **I.     GC Services Offers A Variety Of Services In California**

10         GC Services operates three call centers in California:  the Los Angeles National Service

11   Center ("LA NSC") and the GC Courts Services ("GCCS") center are in Irwindale, California;

12   the San Diego National Service Center ("San Diego NSC") is in San Diego.[1]  The telephone-

13   dedicated agents (collectively, "account representatives") in those centers hold different titles,

14   provide different types of services, report to different managers, work on different teams, work

15   different shifts, and support different types of customers.[2]

16         Since March 2006, approximately 1,446 potential class members have worked for GC

17   Services at its California call centers, and they have been classified as non-exempt throughout

18   the relevant time period.[3]  From February 2005 to September 2008, Gardner worked for GC

19   Services as an account representative at the San Diego NSC.  She never worked at either the LA

20   NSC or the GCCS call center,[4] and she fails to offer any evidence from an account representative

21   who worked in those offices.

22

23

24   [1] Webb Dep. at 7:23-24, 9:23-10:4, 12.

25   [2] Webb Dep. at 11:18-12:13, 20:12-17, 22:25-12:3, 25:4-22; Rodriguez Decl. ¶ 2.  *Compare, e.g.,* Lantow Decl. ¶ 12 (searches for debtors or "skip traces" by using various computer
26   programs) *with* Macias Decl. ¶ 9 (never searches for debtors and does not have access to those applications).

27   [3] Jackson Decl. ¶ 5.

    [4] Gardner Dep. at 9:1-8.

28

                                         2
13117824v.3

## II.     GC Services' Timekeeping Polices Prohibit Unpaid Work

### A.     GC Services Instructs Its Employees To Report All Time Worked, Including Time Spent Logging In To Any Work Systems

It has always been GC Services' policy to pay for all time worked by its employees.  The Company instructs its account representatives that they are required to record all hours worked, and that they are prohibited from performing any of their job duties — including logging in to any work systems — "off the clock."  GC Services disseminates these policies through its new hire packet, employee orientation, and training.

Before March 1, 2010, the new hire packet given to account representatives contained a "Time Card Accuracy Policy" that stated:

> Each GC Services' employee is responsible for the accuracy of his/her hours to be paid for each payroll period, as detailed on the employee's time card.
>
> Prior to signing time cards for the current pay period, each employee should review the total hours to be paid.  Any discrepancy should be brought to the attention of the respective Manager or Supervisor for resolution.[5]

Although that policy accurately reflected GC Services' expectation that employees should report all time worked, GC Services expanded upon its language to confirm that all employees understand the policy.  The current version, effective March 1, 2010, provides:

> GC Services' employees are responsible for accurate time reporting.  No matter what time keeping system is used, the first thing any non-exempt employee should do at the beginning of his/her shift is to log in to the timekeeping system.  No other work-related activities should be undertaken before logging in to the timekeeping system.  Similarly, the last thing any non-exempt employee should do at the end of his/her shift is log off the timekeeping system.  No other work-related activities should be undertaken after logging off the timekeeping system.
>
> In addition, GC Services provides employees with an unpaid meal period each day . . . . The last thing employees must do before beginning a meal period is log off the timekeeping system; the first thing they must do after the meal period is log in to the timekeeping system before beginning work again.  No work-related activities may take place during the meal period.[6]

Moreover, during employee orientation and training, account representatives are instructed to clock in for payroll purposes *before* logging in to any work programs or systems

---

[5] Jackson Decl. ¶ 7, Ex. B.

[6] Jackson Decl. ¶ 7, Ex. A.

and *before* performing any of their job duties.[7]  These employees are also told that they are prohibited from performing any work "off the clock," including before and after their scheduled shift and during breaks.[8]  Numerous account representatives have confirmed GC Services' policy that employees clock in to the timekeeping system before performing any work (which includes loading any systems that they need to perform their job) and clock out only after they have completed all of their work.[9]  Not only have these account representatives confirmed that they were aware of the Company's time-keeping policies, they confirmed that they followed them. That is, none worked "off the clock."[10]

Nonetheless, if an account representative "believes he or she has worked without pay (even if only a few minutes), the employee must report that to GC Services."[11]  The manager then corrects the employee's reported time to capture the additional work performed.[12]

**B.    GC Services Enforces Its Timekeeping Policies In Several Ways**

Gardner's vague allegations of wage-hour violations have no basis in fact.  GC Services' policy is to pay for all time worked and its practices enforce that policy.  If, for example, an account representative ever has a delay or other problem clocking in or out of the timekeeping system, the employee's time entry will be adjusted to accurately reflect when the employee started working (or tried to start working).[13]  To ensure employees are paid for their work time, GC Services requires account representatives to review and verify the accuracy of their work hours each pay period, and they can do so on a daily basis.[14]  Consistent with GC Services'

---

[7] *See, e.g.,* Alexander Decl. ¶ 4 ("I currently teach a timekeeping tutorial for new hires, during which I emphasize that Account Representatives must clock in to the timekeeping system (PeopleSoft) before they do anything work related"); Ramirez Decl. ¶ 4; Rodriguez Decl. ¶ 5.

[8] *See, e.g.,* Alexander Decl. ¶ 10 ("GC Services managers, including myself, make it clear that working 'off the clock' is not permitted or allowed"); Lantow Decl. ¶ 16; Lagutan Decl. ¶ 7.

[9] *See, e.g.,* Gomez Decl. ¶¶ 4, 13; Martinez Decl. ¶¶ 4, 12; Galindo Decl. ¶¶ 5, 11.

[10] *See, e.g.,* Martinez Decl. ¶ 15 ("[t]hroughout my ten years of employment with GC Services . . . I have never performed any of my job duties 'off the clock'");Collins Decl. ¶ 3.

[11] Jackson Decl. ¶ 7, Ex. A.

[12] *See, e.g.,* Ruiz Decl. ¶ 6; Macias Decl. ¶ 6.

[13] *See, e.g.,* Gardner Dep. at 51:18-52:4; Ruiz Decl. ¶ 6; Gomez Decl. ¶ 6.

[14] *See, e.g.,* Gardner Dep. at 25:18-23, 26:24-27:15; Gomez Decl. ¶ 17.

---

4

13117824v.3

1    policy of paying for all time worked, account representatives record and are paid overtime,

2    regardless of whether they are scheduled to work it.[15]   To avoid any possibility of working

3    without being paid, account representatives are instructed to leave their desk and the work area

4    when they are off the clock,[16] meaning they cannot eat or even read at their desk even while off

5    the clock.[17]   Account representatives are prohibited from answering calls after they have clocked

6    out for meals or at the end of their shift.[18]   If they want to answer the call, they first have to clock

7    back in.[19]   The evidence shows that managers follow the company policy in confirming that

8    account representatives are on the clock while working,[20] and they do not ask employees to work

9    off of the clock.[21]

10   **III.     Account Representatives Record Their Hours Electronically**

11           Account representatives in California have always recorded their own time.  Since 2004,

12   they have used two different timekeeping systems to do so.  Before August 2008, account

13   representatives recorded their time through a computer-based system called Star.  Since

14   August 2008, they record their hours through a computer system called PeopleSoft.[22]

15           Both systems function like a wall-mounted time clock.  Employees are instructed to

16   leave their computers on when they leave for the day, so their computers are on when they

17   arrive to work.[23]   To clock in, employees simply unlock or log into their computer, click on

18

19   [15] *See, e.g.,* Gardner Dep. at 40:9-20, 96:9-12; Conley Dep. at 29:2-4, 58:15-59:3, 122:13-17.

20   [16] *See, e.g.,* Martinez Decl. ¶ 12 ("Managers at this call center are especially strict on
     timekeeping ─ I do not believe that managers would ever allow an Account Representative to
21   clock out and continue to work off the clock.").

22   [17] *See, e.g.,* Lantow Decl. ¶ 10 ("I am a student and on several occasions have tried to do
     homework at my desk during my lunch break.  But my manager always tells me that I am not
     allowed on the floor or at my desk if I am off the clock."); Lagutan Decl. ¶ 7 ("I am not allowed
23   to eat or read at my desk if I am off the clock.").

24   [18] *See, e.g.,* Martinez Decl. ¶ 12; Rodriguez Decl. ¶ 11.

     [19] *See, e.g.,* Lagutan Decl. ¶ 7.
25
     [20] *See, e.g.,* Martinez Decl. ¶ 10.
26
     [21] *See, e.g.,* Conley Dep. at 54:1-5, 85:10-14, 96:7-16; Macias Decl. ¶ 14; Ramirez Decl. ¶ 12.

27   [22] Webb Dep. at 32:4-12; 20-24.

     [23] Webb Dep. at 59:12-19.
28

OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

13117824v.3

the timekeeping icon, and enter their employee name and password.[24]  This process takes between thirty seconds and two minutes to complete.[25]  If there are any system issues or delays, however, employees can go to a manager and have their time adjusted to accurately reflect when the employee tried to start his or her work day.[26]

Some employees also clock in through other employees' or managers' computers, so they are clocked in *before* they even go to their desks and computers for the day.[27]  For example, Gardner testified that she would sometimes ask her manager to clock her in when she arrived at the center,[28] or she would clock in through another employee's computer "right when [she] would arrive to [her] desk."[29]  Gardner also testified that she clocked other employees in:

> Q.  Did you ever clock any other hourly employees in or out of Star?
>
> A.  If I did, it was just — it was known.  It wasn't a secret.  It was them arriving a little bit late and saying, "Hey, Brooke, I'm late, clock me in." Because they didn't have time to start their computer up and actually clock in.  So, yes, I have.[30]

## IV.   When Account Representatives Are Allowed To Clock In To The Timekeeping System And Begin Working Varies

When account representatives are permitted to clock in to the timekeeping system and begin working varies by call center and within call centers.  At the San Diego NSC call center, account representatives are not allowed to clock in and begin working until five minutes before their scheduled start times.[31]  By contrast, the LA NSC and GCCS centers do not allow

---

[24] *See, e.g.,* Gardner Dep. at 55:22-56:6 ("The first thing I would have to do is put in the user name and the password to unlock the computer and then we would log on to STAR [the timekeeping system]."); Ramirez Decl. ¶ 6; Ruiz Decl. ¶ 5.

[25] *See, e.g.,* Rodriguez Decl. ¶ 6 (30 seconds or less); Collins Decl. ¶ 9 (1 minute or less); Galindo Decl. ¶ 6 (1-2 minutes).

[26] *See, e.g.,* Alexander Decl. ¶ 9; Rodriguez Decl. ¶ 7; Gomez Decl. ¶ 6; Macias Decl. ¶ 6.

[27] Gardner Dep. at 22:3-23:9; Parotino Dep. at 54:2-23.

[28] Gardner Dep. at 59:12-61:5.

[29] Gardner Dep. at 61:6-11.

[30] Gardner Dep. at 22:13-19.

[31] *See, e.g.,* Alexander Decl. ¶ 6.

OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

13117824v.3

employees to clock in and begin working until their actual start time.[32]  If an employee is pre-authorized to work overtime, however, that employee is not subject to the above restrictions.[33]

**V.      Account Representatives Are Not Required To Work Before Their Scheduled Shift**

Gardner alleges that members of the putative class had to arrive "at least 10 minutes" before their scheduled start time to avoid being considered tardy.  (Pl.'s Mem. at 4.)  But, when questioned under oath, her own testimony contradicts that allegation:

> Q.      Did anyone every tell you that you were expected to arrive at your desk prior to the start of your shift?
>
> A.      I don't believe they told me that I needed to be there prior to my shift, but they did tell me I needed to be working at the start of my shift.[34]

Even if Gardner's allegation that she was required to arrive at work early were true, the evidence shows that her experience is not typical or common to the class.  Incidents of employees' late arrival to work are recorded as "occurrences."  Whether account representatives are considered tardy and receive an "occurrence" is based on when they clock in to the *timekeeping* system, not the work system.  At the LA NSC and GCCS call centers, account representatives are given a six-minute grace period to clock in before they are considered tardy.  Employees in those centers, therefore, are not considered late unless they clock in seven or more minutes after their start time.  By contrast, employees in San Diego are not given a grace period (unless there is a system issue).[35]

These grace periods, or lack thereof, affect when account representatives arrive at the call centers, and those variations directly impact Gardner's allegation that employees had to arrive early and perform duties off the clock to avoid being tardy.  Many account representatives at the LA NSC and GCCS centers, for example, take advantage of the grace period and regularly arrive

---

[32] *See, e.g.,* Rodriguez Decl. ¶ 14.

[33] *See, e.g.,* Lagutan Decl. ¶ 11 ("I try to arrive around thirty minutes before my scheduled start time and start working.  However, I always clock in through the timekeeping system before I perform any of my job duties, and I get paid for that pre-shift work.").

[34] Gardner Dep. at 45:17-46:3.

[35] Gardner Dep. at 50:7-51:23.

OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

13117824v.3

right at the start of their scheduled shift or even a few minutes after it.[36]  If they clock in to the timekeeping system within the grace period, they are considered on time and do not receive an occurrence.[37]  San Diego employees, on the other hand, must be clocked in at the start of their shift to be considered on time.  Nothing about that requirement, however, suggests or requires that employees work off the clock to avoid being tardy, particularly since it is their clock-in time — and not the log-in to other systems — that determines if they are tardy.

In fact, all three California call centers *prohibit* employees from going to their desks before they are allowed to clock in — which, as discussed, varies by call center — unless they have pre-approved overtime.[38]  For example, employees in San Diego cannot go to their desks until five minutes before their scheduled start times,[39] and those who work the first shift (which starts at 5:00 a.m.) cannot even access the center itself until five minutes before their scheduled start time.[40]

## ARGUMENT

### I.      Standard For Class Certification

#### A.      Rule 23 Requires A Rigorous Analysis Of The Propriety Of Trying This Case As A Class Action

As the party seeking to certify a class, Gardner bears the burden of proving that her case meets the requirements of Rule 23.  *McPhail*, 247 F.R.D. at 608.  Gardner must first satisfy all four elements of Rule 23(a): numerosity, commonality, typicality, and adequate representation. Fed. R. Civ. P. 23(a).  Failure to meet any one of these prerequisites precludes certification as a class.  *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

---

[36] *See, e.g.,* Galindo Decl. ¶ 8 ("Because employees are given a 7-minute grace period, I often arrive at the call center right at my scheduled start time, or even five minutes after it."); Gomez Decl. ¶ 10; Macias Decl. ¶ 8.

[37] *See, e.g.,* Galindo Decl. ¶ 8 ("even when I arrive five minutes after my start time, I'm still considered on time if I clock in within the grace period (which I'm able to do)"); Martinez Decl. ¶ 8; Gomez Decl. ¶¶ 10, 11; Macias Decl. ¶ 8.

[38] *See, e.g.,* Ramirez Decl. ¶ 7; Rodriguez Decl. ¶ 14; Lagutan Decl. ¶ 11.

[39] *See, e.g.,* Alexander Decl. ¶ 6.

[40] *See, e.g.,* Alexander Decl. ¶ 5; Lantow Decl. ¶ 8.

13117824v.3

1    Even if Gardner could meet this initial burden, she also would need to satisfy at least one

2    of the subsections of Rule 23(b).  *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir.

3    2001).  Gardner has moved to certify her class under Rule 23(b)(3), which requires her to show

4    "that the questions of law or fact common to the members of the class predominate over any

5    questions affecting only individual members," and "that a class action is superior to other

6    available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P.

7    23(b)(3).

8    Class certification requires a "rigorous analysis" into the propriety of proceeding as a

9    class.  *Zinser*, 253 F.3d at 1186.  In conducting this rigorous analysis, "[a] preliminary inquiry

10   into the merits is sometimes necessary to make a meaningful determination of class certification

11   issues."  *Garcia v. Sun Pac. Farming Coop.*, No. 06-0871, 2008 WL 2073979, at *13 (E.D. Cal.

12   May 14, 2008).  If liability hinges on individual facts or is subject to individualized defenses —

13   such as here — common issues will not predominate and the class is not certifiable.  *Jiminez v.*

14   *Domino's Pizza, Inc.*, 238 F.R.D. 241, 251-52 (C.D. Cal. 2006).

15   **B.     The Mere Fact That Another Court Certified An FLSA Collective**
         **Action, Under An Entirely Different —And More Lenient — Standard**

16       **Does Not Support Rule 23 Class Certification Here**

17   Gardner invokes another court's decision granting <u>conditional</u> certification under the Fair

18   Labor Standards Act in a separate action against GC Services to suggest that this Court should

19   arrive at the same result by certifying a Rule 23 class.  But collective actions under the FLSA are

20   not subject to the requirements of Rule 23 and it is indisputable that FLSA conditional

21   certification involves a much lower threshold.  *See Clesceri v. Beach City Investigations &*

22   *Protective Servs., Inc.*, No. CV-10-3873, 2011 WL 320998, at *4 (C.D. Cal. Jan. 27, 2011)

23   (finding the "common questions predominate" standard under Rule 23(b)(3) much higher than

24   the "similarly situated" standard under the FLSA); *Norris-Wilson v. Delta-T Group, Inc.*, No. 09-

25   0916, 2010 WL 2196066, at *3 (S.D. Cal. June 1, 2010) (stating that "it is *easier* to conditionally

26   certify an action under 216(b) of the FLSA than to certify an action under Rule 23"); *Hill v. R+L*

27   *Carriers, Inc.*, 690 F. Supp. 2d 1001, 1009 (N.D. Cal. 2010) ("The requisite showing of

28

9

13117824v.3

1    similarity of claims under the FLSA is considerably less stringent than the requisite showing

2    under Rule 23 of the Federal Rules of Civil Procedure.").

3         Indeed, the very decision Gardner points to, *Beasley v. GC Services*, 270 F.R.D. 442, 444

4    (E.D. Mo. 2010), emphasized that plaintiffs' burden at the conditional certification stage was

5    "low" and "not onerous."  And, contrary to the suggestion of finality made by Gardner, the

6    *Beasley* court did not even conclude that plaintiffs met the FLSA's "similarly situated" standard.

7    Instead, the court opined that "[t]hat determination is made during the second step of the process,

8    after the close of discovery."  *Id.*  The granting of first-stage conditional certification under a less

9    stringent legal standard in a separate case alleging FLSA violations in a different jurisdiction has

10   no bearing on the Court's analysis here.

11   **C.    Plaintiff Cannot Satisfy Her Burden Simply By Pointing To The**
         **Certification Of Other Wage And Hour Class Actions**

12        Relying in part on the certification affirmed by the Ninth Circuit in *Dukes v. Wal-Mart*,

13   509 F.3d 1168 (9th Cir. 2007),[41] Gardner also attempts to sidestep her burden by summarily

14   claiming that "there is nothing unique about this case that makes [her] claims less susceptible to

15   class treatment than other wage and hour cases that have been certified."  (Pl.'s Mem. at 17.)

16   Gardner's conclusory argument, however, fails to satisfy her burden.  Although other wage-hour

17   cases have been certified before and after *Dukes*, "there is no rule that requires that wage-and-

18   hour claims be certified for class treatment regardless of the evidence submitted in support of the

19   motion for certification."  *Washington v. Joe's Crab Shack*, No. C 08-5551, 2010 WL 5396041,

20   at *14 (N.D. Cal. Dec. 23, 2010).  Indeed, since *Dukes*, several courts in the Ninth Circuit have

21   denied certification in wage-hour cases.  *See, e.g.*, *id.* (denying class certification in wage-hour

22   case); *Spainhower v. U.S. Bank Nat'l Ass'n*, Nos. 08-137 & 08-645, 2010 WL 1408105, at *5

23   (C.D. Cal. Mar. 25, 2010) (same); *Koike v. Starbucks Corp.*, No. C 06-3215, 2008 WL 7796650,

24   at *11 (N.D. Cal. June 20, 2008) (same), aff'd, 378 Fed. Appx. 659, 2010 WL 1784727 (9th Cir.

25   May 5, 2010); *Mateo v. V.F. Corp.*, No. 08-5313, 2009 WL 3561539, at *7 (N.D. Cal. Oct. 27,

26   2009) (same); *Garcia*, 2008 WL 2073979, at *14 (same).  *Washington* is instructive.

27   _____

     [41] The Supreme Court accepted *certiorari* in *Dukes* on December 6, 2010.

28

                                            10
     OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

In *Washington*, the plaintiff, like Gardner, claimed that he was not paid for all time worked because managers "shaved" the time that he entered in the electronic timekeeping system and required him to clock out at the end of his shift before he completed his work.  2010 WL 5396041, at *3.  The employer, like GC Services, established that it had lawful policies prohibiting off-the-clock work and it submitted declarations from employees confirming that they were paid for all time worked.  *Id.* at *13.  As a result, the court concluded that individualized inquiries would be necessary to determine whether employees were told to work off the clock and whether managers shaved time off employees' time cards.  *Id.*  The court, therefore, denied class certification.  *Id.* at *14.  The same deficiencies exist here with Gardner's motion to certify a class.

## II.     Plaintiff's Proposed Class Cannot Satisfy Rule 23(a)

The differences among putative class members prevent Gardner from establishing the commonality, typicality, and adequacy elements of Rule 23(a).

### A.     There Are No Questions Of Law Or Fact Common To The Class That Will Advance The Litigation

Commonality requires a showing that the class claims arise from a common nucleus of operative fact and that relief turns on questions of law applicable in the same manner to each member of the class.  *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982).  Rule 23 requires plaintiffs to establish more than simply that they share a common cause of action, but that the cause of action can be proven or defended — for the entire class — using common proof.  *Howard v. Gap, Inc.*, No. C 06-06773, 2009 WL 3571984, at *5 (N.D. Cal., Oct. 29, 2009) ("It is not enough for the class representative to testify as to his or her story.  There must be a common method of proof that tends to establish the required elements of liability as to all class members."); *Bishop v. Petro-Chem. Transp., LLC*, 582 F. Supp. 2d 1290, 1307 (E.D. Cal. 2008) (finding commonality requirement not satisfied where plaintiff presented no evidence of a company-wide policy or practice of improperly denying overtime compensation other than the plaintiff's declaration claiming he was denied overtime).

1        Here, Gardner contends that commonality is satisfied based on a list of generalized

2  questions that can be posited about virtually every employer (e.g., "Whether GC Services'

3  policies violated California labor laws and resulted in unpaid straight time and overtime to class

4  members."). (Pl.'s Mem. at 9.) But "at a sufficiently abstract level of generalization, almost any

5  set of claims can be said to display commonality. What [courts] are looking for is a common

6  issue the resolution of which will advance the litigation." *Sprague v. Gen. Motors Corp.*, 133

7  F.3d 388, 397 (6th Cir. 1998). No such issue is present here. Instead, Gardner attempts to create

8  a common issue by misrepresenting GC Services' policies and the testimony of its 30(b)(6)

9  witness, and by offering her own superficial declaration and two cookie-cutter declarations from

10  former employees Michael Parotino and Cartier Conley. Not only is this evidence sparse, but it

11  does not support Gardner's claim that GC Services had a company-wide policy that required

12  account representatives to work off the clock. Indeed, numerous account representatives have

13  confirmed that they were paid for all hours worked.

### 1. GC Services does not have a policy that prohibits account representatives from recording all hours worked

16        First, Gardner points to two GC Services policies that she claims require employees to

perform a number of tasks before they clock in. (Pl.'s Mem. at 3.) But Gardner misrepresents

both of these documents. The first policy she cites to is San Diego's local office practices, which

merely instruct employees to "[c]lock in at your scheduled start time; punch out for your lunch

break; punch back in from your lunch break; and punch out immediately following the end of

your shift."[42] She also relies on the local office practices for the LA NSC and GCCS centers,

which state:

> When you clock in you **must** be at your workstation ready to work. You may not
> leave to park your car, use the restroom, go to the cafeteria, get the paper or talk
> on your cell phone. All this personal business must [] be taken care of prior to
> you clocking in for the day, breaks, and lunch — there are absolutely no
> exceptions.[43]

---

[42] Webb Dep. at 85:12-23, 86:11-13, Ex. 27 at 3.

[43] Webb Dep. at 86:17-24, Ex. 28 at 10 (emphasis in original).

13117824v.3

Neither of these local policies requires or suggests that employees perform any of their job duties before clocking in.  There is simply no such policy.  In fact, Gardner's own witness, Cartier Conley, admitted that he never saw or heard of such a policy while he worked for GC Services:

> Q.   Did anyone, during your employment and during the time that you were a senior AR [account representative] toward the end of your employment, tell you not to record time that you worked?
>
> A.   No.
>
> Q.   Were there any documents that stated you weren't to record all of the time that you worked?
>
> A.   No.[44]

### 2.   GC Services' bonus system does not incentivize unpaid work

Citing only to GC Services' 30(b)(6) witness, Sharon Webb, Gardner alleges that "GC Services offered bonus incentives to Account Representatives based on monthly budgets and collections goals, which coerced them into working during their meal and rest periods, and after their shifts."  (Pl.'s Mem. at 5.)  But Webb's testimony does not support this bald assertion.  To the contrary, Webb testified that account representatives are eligible to receive a *discretionary* bonus if they hit their collections goals (i.e., even if employees hit their goals, they are not guaranteed a bonus).[45]  The offer of a discretionary bonus for meeting certain performance goals does not violate state law.  Lacking evidence of unlawful conduct, Gardner grossly distorts the implications of a lawful policy of rewarding performance to suggest that the reward itself "coerced" off-the-clock work.  That allegation, without more, does not establish that GC Services has a policy or plan that violates California's wage and hour laws, and Gardner herself undermines her very argument.  Although Gardner testified that she consistently hit her goals, she admitted that she was never disciplined when she did not meet them.[46]  Indeed, Gardner does not claim that she worked off the clock to hit her collections goals or any other metrics.[47]

---

[44] Conley Dep. at 54:1-8.

[45] Webb Dep. at 48:20-49:9.

[46] Gardner Dep. at 104:21-105:6.

[47] Gardner Decl. ¶¶ 1-7.

OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

13117824v.3

1    Moreover, even if employees were encouraged to work additional time to become

2    eligible for a bonus, Gardner fails to explain why employees would not record this time.

3    Employees are instructed to record all time worked, including overtime, and GC Services paid its

4    California employees for more than 8,000 hours of overtime in 2009 and 2010.[48]  In fact,

5    Gardner admitted that she worked, recorded, and was paid overtime — even when it was not pre-

6    approved.[49]

### 3.    Plaintiff's declarations do not identify a single unlawful plan or policy

7

8    Gardner's reliance on her own declaration and those from two former employees is

9    similarly misplaced.  These declarations do not establish that GC Services engaged in

10   standardized conduct towards members of the proposed class.

11   First, the declarations are vague and conclusory, and therefore are insufficient to establish

12   a company-wide policy or practice.  *See Sarviss v. Gen. Dynamics Info. Tech. Inc.*, 663 F. Supp.

13   2d 883, 905 (C.D. Cal. 2009) (denying conditional certification where plaintiff's declarations

14   were vague and general, finding such declarations insufficient to satisfy his burden to show they

15   were subject to a common policy); *In re Peregrine Sys., Inc. Sec. Litig.*, No. 02 CV 870-J(RBB),

16   2002 WL 32769239, at *6 (S.D. Cal. Oct. 11, 2002) (finding "conclusory declarations . . .

17   insufficient to establish compliance with Rule 23").  In her declaration, for example, Gardner

18   claims, "I also worked unpaid time after my scheduled shift performing various tasks such as

19   finishing calls, completing reports, and reading correspondence from management."[50]  But

20   evidence that some employees were not compensated for work is insufficient to merit

21   certification.  Rather, Gardner must offer evidence that "the *reason* why the employees were not

22   compensated . . . is not because of human error or a rogue store manager, but because of a

23   corporate decision to ignore [defendant's] published policies and refuse to pay for [certain

24

25   _____

     [48] Jackson Decl. ¶ 6.

26   [49] Gardner Dep. at 39:25-40:20, 96:9-12; *see also* Conley Dep. at 29:2-4, 58:15-59:3, 122:13-17

27   (admitting that he recorded and was paid overtime).

     [50] Gardner Decl. ¶¶ 5-7.

28

OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

13117824v.3

1  tasks].”  *Thompson v. Speedway SuperAmerica LLC*, No. 08-cv-1107, 2009 WL 130069, at *2

2  (D. Minn. Jan. 20, 2009); *Saleen v. Waste Mgmt., Inc.*, No. 08-4959, 2009 WL 1664451, at *4-5

3  (D. Minn. June 15, 2009) (denying motion for conditional certification where 112 employee

4  declarations failed to show that the reason why employees worked off the clock was due to a

5  single decision, policy, or plan).  Gardner’s declaration, however, does not offer *any* reason

6  whatsoever for why she was allegedly not paid for this time (e.g., she does not contend that her

7  time was “shaved” or that her supervisor told her not to record all time worked).

8          The declarations submitted by Conley and Parotino are equally vague.  They both state,

9  for example, “[b]ecause of the metrics on which telephone representatives were evaluated, I also

10  observed telephone representatives performing unpaid work after the end of their scheduled shift

11  and during meal breaks.”[51]  But they fail to describe what these “metrics” were, how they knew

12  that the employees were not being paid while they performed these tasks, or why they were not

13  paid for this time.

14          Second, even if Gardner’s three declarations ─ out of a potential class of 1,446 ─ had

15  provided more detail, “it is simply too much of a stretch . . . to conclude” that such isolated

16  incidents present a question of fact common to the class.  *Velasquez v. HSBC Fin. Corp.*, 266

17  F.R.D. 424, 432 (N.D. Cal. 2010) (plaintiffs’ “sparse evidence” concerning pay practices with

18  respect to eleven out of 10,000 putative class members was insufficient to show a common

19  policy or plan); *see Wilson v. Kiewit Pac. Co.*, No. 09-03630, 2010 WL 5059522, at *5 (N.D.

20  Cal. Dec. 6, 2010) (finding that an isolated violation of wage and hour law “is not sufficient to

21  demonstrate a widespread practice that supports class certification”).

22          Finally, Gardner’s declarations should be given little, if any, weight because they are

23  contradicted by each declarant’s own deposition testimony.  *Dunbar v. Albertson’s, Inc.*, 47 Cal.

24  Rptr. 3d 83, 88 (2006) (disregarding putative class member declarations and giving “the greatest

25  weight to deposition testimony because it reflects a witness’s actual testimony on cross

26  examination and (unlike declarations . . .) cannot be scripted by counsel”).  These include:

27

28

---

[51] Conley Decl. ¶ 13; Parotino Decl. ¶ 13.

13117824v.3

| **Declaration** | **Deposition Testimony** |
|---|---|
| "After logging in to my designated computer and software applications, I then was required to log into the phone system to handle calls at the start of my scheduled shift." (Gardner Decl. ¶ 4.) | "Q. Did you have to log into your phone? A. No." (Gardner Dep. at 65:8-9.) |
| "In addition, I also worked unpaid time . . . during lunch breaks . . . ." (Gardner Decl. ¶ 6.) | "Q. Were you allowed to stay at your desk during your meal break? A. No." (Gardner Dep. at 72:21-23.) |
| "I have worked for GC Services . . . as an hourly-paid telephone representative at the San Diego and Irwindale call centers . . . ." (Parotino Decl. ¶ 2.) | "I was not an hourly employee in Irwindale." (Parotino Dep. at 129:5.) |
| "After logging in to my designated computer and software applications, I then was required to log into the phone system to handle calls at the start of my scheduled shift.  I was required to log-in to the phone system at the start of my scheduled shift." (Parotino Decl. ¶ 4.) | "Q. Did you ever have to log in to your telephone? A. No." (Parotino Dep. at 79:3-4.)<br><br>"Q. Did the ARs [account representatives] in the L.A. office — the ARs on your team — did they have to log into the telephone system to use it? A. No." (*Id.* at 102:20-23.) |
| "As a telephone representative, in addition to performing work before my scheduled shift for which I was not paid, I also worked unpaid time after my scheduled shift or during lunch breaks performing various tasks such as finishing calls, completing reports, and reading correspondence from management." (Conley Decl. ¶ 6.) | "Q. Did you ever have any instances where you were on a call that went beyond the end of your shift? A. Yes. Q. And what happened in that case?  Would you record that time? A Yes. Q. And were you paid additional wages if your call ran over your scheduled shift? A. Yes." (Conley Dep. at 78:16-24.)<br><br>"Q. Now, for the time that you were a senior AR [account representative], are you claiming that there was any time that you worked after you clocked out of Star at the end of your shift for which you weren't paid? A. I don't recall." (*Id.* at 84:3-7.) |
| "GC Services management was aware that telephone representatives were working unpaid time, and the requirement to arrive early and work unpaid time was a common complaint by telephone representatives." (Conley Decl. ¶ 14.) | "Q. And did you ever complain to anyone at GC that you were not being paid for all of the time that you worked? A. No. (Conley Dep. at 54:9-12.)<br><br>"Q. Did you ever tell your supervisor during the time you were a senior AR that you weren't being paid for the time that you were loading the software and that it was taking 10 minutes? A. No." (*Id.* at 57:8-12.)<br><br>"Q. Do you know if anyone complained about working but not recording their time during your employment? A. Not that I recall." (*Id.* at |

16

13117824v.3

| **Declaration** | **Deposition Testimony** |
|---|---|
| | 111:3-6.) |
| Account representatives had to review "emails" before their shifts started.  (Parotino Decl. ¶ 11; Conley Decl. ¶ 11.) | "Q.  Did you have a company e-mail address during the time that you were an AR?  A.  No." (Parotino Dep. at 72:20-22.)  "Q.  Did other telephone representatives have e-mails?  A.  I don't think so.  I don't think any account representatives had e-mails.  I don't recall having an e-mail." (Conley Dep. at 112:3-7.) |

### 4.   Declarations submitted by GC Services show significant differences among the potential class members

The declarations of the account representatives offered by GC Services establish additional differences between Gardner's alleged experience and those of the members of the putative class.  Gardner, for example, claims that she had to be ready to handle calls the moment her shift began.[52]  Yet some account representatives work shifts that start 15 minutes *before* the telephones are even turned on for the day.[53]  Gardner also contends that she had to log into *multiple* work systems and applications, including skip tracing programs.[54]  By contrast, other account representatives do not have access to skip tracing programs and only have access to a *single* work system.[55]  While Parotino was a manager, he claims that he required employees to work off the clock before and after their shifts and that he shaved time from his employees' timesheets.[56]  But an employee whom Parotino supervised denies this claim:

> In approximately 2007 and 2008, when I worked as an Account Representative for GC Services, Michael Parotino was my manager.  Michael Parotino never asked or told me to come in before the start of my scheduled shift

---

[52] Gardner Dep. at 46:9-15.  Gardner claims in her Complaint that employees were "subject to punishment or reprimand" if they were not ready to handle calls at the start of a shift.  (Cmplt. ¶ 11.)  At her deposition, however, Gardner admitted that "there wasn't any repercussions" if she was not ready to handle calls right at her start time.  Gardner Dep. at 47:4-20; *see also id.* at 95:14-96:5 (admitting that, at worst, employees would be asked, "Why aren't you ready?").

[53] *See, e.g.,* Gomez Decl. ¶ 8.

[54] Gardner Decl. ¶¶ 3-4; Gardner Dep. at 58:23-59:7.

[55] *See, e.g.,* Martinez Decl. ¶¶ 4, 11; Macias Decl. ¶ 9.

[56] Parotino Dep. at 39:23-40:1; 57:3-23; 88:9-13; 89:21-23; 90:11-15; 108:11-109:12

17

13117824v.3

and he never asked or told me to stay after the end of my scheduled shift.  I would never work without recording my time and I would never work "off the clock" and without pay before or after my shift.  Michael Parotino never reduced or altered the time that I recorded in the timekeeping system, and he never reduced or altered my time after I approved and submitted it.  Nor did he ever ask me to reduce my reported time.[57]

Moreover, all 11 declarants — who worked at all three California locations — state that they: (1) have never been asked or expected to arrive before their shifts start; (2) have never had to log-in to any work systems before their shifts start or before clocking in; (3) were instructed to record all time worked; (4) have never worked off the clock; (5) have never had their self-reported time reduced or altered; (6) have always recorded and been paid for any calls that extend beyond their scheduled shift; and (7) have always been paid properly.[58]  These declarations are factually specific and demonstrate that Gardner's experience of working off the clock was uncommon, if it happened at all.  *See Garcia*, 2008 WL 2073979, at *11 (plaintiffs failed to demonstrate commonality where there was "conflicting testimony" concerning the "application of the wage and hour laws between and among the various Crews").

### 5. An analysis of the walk-in, clock-in, and log-in times demonstrates that Gardner's claims are not common to the putative class

At all California facilities, account representatives swipe their security badges to gain entry into the building.  They then proceed to their work stations (though they first may go to the restroom, place food in the refrigerator in the break room, etc.).[59]  Account representatives are instructed to then clock into the timekeeping system upon arriving at their station, and then log in to any work programs or systems.[60]  Gardner claims that she "regularly arrived at work at least ten minutes before" the start of her shift to perform work-related activities before clocking into the system that tracked her paid time.[61]

---

[57] Rodriguez Decl. ¶ 16.

[58] *See generally* Account Representative Declarations at Exhibit A.

[59] *See, e.g.,* Rodriguez Decl. ¶ 14.

[60] *See, e.g.,* Collins Decl. ¶ 8; Ramirez Decl. ¶ 4.

[61] Gardner Decl. ¶¶ 3-5.

To the extent Gardner's declaration is credited, her claimed experience is not common to the putative class.  A comparison of putative class members' security badge swipe times versus the time they clocked into the system shows that more than 80 percent of them clocked in within *five minutes* of the time they swiped their security badge to gain entry to the facility.[62]  And this would include time spent walking from the security door of the facility to the work station (which Gardner estimated took three minutes),[63] and any other activities conducted between entry into the facility and clocking in to the timekeeping system, such as going to the restroom or break room.[64]  More than 50 percent of the putative class clocked in within *two minutes* of the time they swiped their security badge.[65]  Less than 10 percent saw 10 minutes or more elapse between swiping in and clocking in.[66]  However they spent their time is an individualized inquiry in which the vast majority of the putative class did not share Gardner's claimed experience.

### B.    Plaintiff's Claims Are Not Typical Of The Putative Class

Unlike commonality, "typicality focuses on the relationship of facts and issues between the class and its representatives." *Garcia,* 2008 WL 2073979, at *12.  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotations omitted).

Here, the experiences of Gardner and other putative class members are markedly different.  To support her motion, Gardner relies on the testimony of former employees Conley and Parotino.  But their testimony only underscores the lack of typicality here.  Gardner testified that an unidentified person sometimes cut or altered her timesheets, but Conley admitted that he

---

[62] Wentland Aff. at ¶ 4.

[63] Gardner Dep. at 41:14-19.

[64] Rodriguez Decl. ¶ 14 (explaining that "get[s] coffee and hang[s] out in the building cafeteria" when he arrives at the call center before his shift begins).

[65] Wentland Aff. at ¶ 4, Ex. A.

[66] *Id.*

OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

13117824v.3

1   was always paid for the time on his timesheets.[67]  Gardner also asserts that she sometimes

2   attended team meetings before she clocked in, but Parotino testified that he never attended team

3   meetings at all.[68]  Gardner and Parotino claim that they occasionally logged into "skip tracing"

4   websites[69] before their shift and before clocking in.[70]  By contrast, Conley admitted that he

5   always clocked in before he loaded any skip tracing sites.[71]  Finally, Parotino testified that he

6   would sometimes handle calls before clocking in, but Gardner admitted that she always clocked

7   in first.[72]  These inconsistencies show that Gardner's claims are not even typical of her own

8   witnesses.  *See Slayton v. Iowa Coll. Acquisition Corp.*, No. 09 C 6977, 2010 WL 3937455, at *3

9   (N.D. Ill. Oct. 5, 2010) (finding that plaintiff failed to demonstrate commonality and typicality

10   where the off-the-clock experiences between plaintiff and her two declarants differed).

11       Moreover, as demonstrated above, GC Services' declarations show that the alleged off-

12   the-clock work of Gardner was a rare occurrence and atypical of the experience of the class she

13   seeks to certify.[73]  Accordingly, Gardner's "claims are not typical of the class members, because

14   violations did not occur as to some class members."  *Garcia*, 2008 WL 2073979, at *13.

15       **C.    Plaintiff Is Not An Adequate Class Representative**

16       The unique nature of Gardner's claims also precludes her from adequately representing

17   the class.  *See Mateo*, 2009 WL 3561539, at *5 (issues unique to the named plaintiff made her an

18   inadequate representative).  Moreover, Gardner lacks standing to pursue prospective relief—

---

19   [67] *Compare* Gardner Dep. at 32:12-33:20, 38:16-39:5 *with* Conley Dep. at 52:12-14 ("Q.  And

20   were you paid for all of the time that you recorded on your timesheet?  A.  Yes.").  *See also*
     Parotino Dep. at 83:2-18 (admitted that his time was not cut while he was an hourly college

21   management trainee).

     [68] *Compare* Gardner Dep. at 63:2-64:15 *with* Parotino Dep. at 81:22-25.

22

     [69] Skip tracing websites are tools that some account representatives use to locate debtors.  Not all

23   account representatives, however, skip trace or even have access to skip tracing websites.  *See,
     e.g.,* Lantow Decl. ¶ 12;Rodriguez Decl. ¶ 10; Macias Decl. ¶ 9; Ramirez Decl. ¶ 5.

24   [70] Parotino Dep. at 130:12-20; Gardner Dep. at 58:23-59:11.

25   [71] Conley Dep. at 55:13-15; 56:17-57:7.

     [72] *Compare* Parotino Dep. at 62:4-6, 15-18 *with* Gardner Dep. at 80:20-23.
26

     [73] GC Services is not asking the Court to consider the merits of Gardner's claims.  But a "district
27   court may consider the merits of the claims to the extent that it is related to the Rule 23 analysis."
     *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 n.15 (9th Cir. 2009).

28

OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

13117824v.3

such as the injunctive relief she seeks in the Complaint (Compl., Prayer for Relief, ¶ 4) ─ because she is a former employee and faces no threatening conduct. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (plaintiff must have a "personal stake" in the outcome); *Does v. District of Columbia*, 216 F.R.D. 5, 10 (D. D.C. 2003) (named plaintiffs seeking injunction must face real and immediate danger of being personally injured.). As a former employee, Gardner is in no immediate danger of working for GC Services off the clock. Thus injunctive or declaratory relief against GC Services will not help her in any way. Accordingly, she lacks standing to seek such relief, and cannot properly seek it on behalf of the proposed class.

## III.   Plaintiff's Proposed Class Cannot Satisfy Rule 23(b)(3)

Rule 23(b)(3) requires two findings: predominance of common questions over individual ones and superiority of the class action mechanism. *Stiller v. Costco*, No. 09-cv-2473, 2010 WL 5597272, at *7 (S.D. Cal. Dec. 13, 2010). Neither is present here.

### A.   Individual Questions Will Eclipse Any Common Ones

The predominance criterion is "far more demanding" than Rule 23(a)'s commonality requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Yet all Gardner offers to satisfy her burden are conclusory declarations from Conley and Parotino and her own one-and-one-half page declaration. Gardner's thin evidentiary showing, however, falls far short of carrying her burden of demonstrating that common issues predominate over individual ones. Apparently realizing this, Gardner repeatedly contends that GC Services has "admitted" that Rule 23's requirements are satisfied here through its earlier motion to dismiss or transfer this action under the first-to-file rule based on another case in the Eastern District of Missouri. (Pl.'s Mem. at 6, 9, 15.) Gardner misses the point. Through its earlier motion, GC Services only sought to avoid having to defend itself in multiple forums and never conceded in any way that Gardner's claims are susceptible to class treatment.

More importantly, Gardner's own deposition testimony reveals the individualized nature of her claims. Although Gardner's motion generally alleges that she worked off the clock before

13117824v.3

and after her shifts and during her meal breaks,[74] her sworn testimony shows that her alleged off-the-clock work was sporadic and irregular and not the result of a company-wide policy or practice.  Gardner claims, for example, that she had to arrive to work ten minutes before her shift, but she admitted that her arrival time varied and that other account representatives arrived right at their start times.[75]  Next, Gardner claims that she worked off the clock during her lunch breaks, but "[n]ot frequently."[76]  Gardner also asserts that she "sometimes" skip traced or searched for debtors after clocking out for the day, but that it "did not happen very often."[77]  Similarly, Gardner claims that she had to review memoranda off the clock, but when questioned she acknowledged that only happened infrequently.[78]  Although she claims that she worked off the clock after her shift, she admitted that was the exception and not the rule:

> Q.    So you would always clock out after you finished doing all your work?
>
> A.    Yeah.  Most of the time.  There could have been times when I was told to clock out, I don't remember, but yes, for the most part, I clocked myself out when I was done with my work.[79]

Finally, Gardner contends that "at least once every month" she found a mistake on her timesheets, and that "if it was . . . a matter of hours, they would change it, but if it was a matter of . . . 0.25 . . . I wouldn't say anything."[80]  Importantly, she makes no allegation that she was forced or instructed not to report mistakes of a quarter of an hour or less, and her decision not to do so cannot be twisted into a company-wide plan or policy of violating wage and hour laws.

---

[74] Although Gardner's Complaint does not include a meal period claim, her motion references a meal period claim and relies on cases certifying such claims.  (*See, e.g.*, Pl.'s Mem. at 14.)  Because this claim is not part of this case, GC Services does not address it in this memorandum.  Nonetheless, as this Court has held, meal-period claims are not susceptible to class treatment.  *Salazar v. Avis Budget Group, Inc.*, 251 F.R.D. 529, 534 (S.D. Cal. 2008).

[75] Gardner Dep. at 52:5-22, 54:7-14, 55:4-17, 59:12-61:16.  Conley and Parotino also admitted that account representatives arrived right at their scheduled start times.  Conley Dep. at 69:25-70:2; Parotino Dep. at 77:11-23.

[76] Gardner Dep. at 99:2-4.

[77] Gardner Dep. at 87:20-88:2.

[78] Gardner Dep. at 93:18-94:5.

[79] Gardner Dep. at 33:6-11; *see also id.* at 109:15-24 (admitting that the "general practice" was to "clock out when you're done").

[80] Gardner Dep. at 36:11-20.

OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

13117824v.3

1   The evidence adduced in this matter, in fact, shows that adjustments to Gardner's time *increased*

2   her reported work time.  On January 11, 2008, for example, Gardner's time was adjusted from

3   39.75 to 40.25 hours, resulting in her receiving an additional half hour of pay and overtime.[81]

4         Even if Gardner's claims set forth in her motion and declaration were true, "[i]solated

5   examples of deviations from a systemwide policy do not support class certification."  *Stevens v.*

6   *Harper*, 213 F.R.D. 358, 380 (E.D. Cal. 2002); *see also Smith v. T-Mobile USA, Inc.*, No. CV 05-

7   5274 ABC (SSx), 2007 WL 2385131, at *6 (C.D. Cal. Aug. 15, 2007) (denying conditional

8   certification where "the proffered evidence indicates only sporadic violations arising from

9   individual circumstances").  In short, there is no way to determine whether any account

10  representative failed to record all time worked or had his or her timesheets altered as alleged by

11  Gardner without specific testimony from that individual employee.  As discussed above, the

12  alleged practices that led to any underreporting of hours varied, and the vast majority of the

13  declarants reported, and were paid for, all time worked.

14        Moreover, Gardner's theory that "GC Services' policies and employee evaluation metrics

15  caused Account Representatives to work during meal and break periods" (Pl.'s Mem. at 15)

16  requires individualized inquiries, as evidenced by Gardner's admission that she rarely worked off

17  the clock during her lunch breaks.  Indeed, courts have routinely denied class certification where

18  plaintiffs claim that their employer's lawful policies "incentivized" them to work off the clock.

19  *See, e.g.*, *Velasquez*, 266 F.R.D. 424 (denying conditional certification where plaintiffs claimed

20  that company's sales targets required employees to work off the clock so as to meet those

21  targets); *Koike*, 2008 WL 7796650, at *8 (denying class certification and finding that the

22  plaintiff's premise is "flawed" because "significant individual fact determinations would be

23  required" to show that class members were incentivized to work off the clock); *In re Wal-Mart*

24  *Wage & Hour Emp't Litig.*, No. 2:06-CV-00225, 2008 WL 3179315, at *4, 15 (D. Nev. June 20,

25  2008) (denying class certification where plaintiffs claimed that "aggressive cost control"

26  pressure led managers to alter time records).

27

    [81] Jackson Decl. ¶ 8, Ex. C.

28

OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION

13117824v.3

1    Just as each putative class member must show that he or she has suffered actual harm,

2   GC Services is entitled to pursue individual defenses against each one of them.  GC Services

3   may have grounds to assert some or all of the following defenses, among other defenses, against

4   any putative class member:  (1) he or she did not in fact work off the clock; (2) the purported off-

5   the-clock time was not compensable; (3) any off-the-clock time was *de minimis*; or (4) GC

6   Services did not know that the employee was working off the clock voluntarily for reasons

7   unique to that employee.  Conley, for example, admitted that he was never asked to work off the

8   clock and that he never told anyone he worked off the clock,[82] so there is no evidence that GC

9   Services required or even knew about Conley's alleged off-the-clock work.  Gardner's testimony

10  shows that her broad allegations of uncompensated time are greatly diminished when subjected

11  to cross-examination.  GC Services defenses and objections will necessarily vary from claimant

12  to claimant — a fact that further underscores the uniqueness of the individual inquiries and makes

13  class treatment inappropriate.  *Mateo*, 2009 WL 3561539, *6 (predominance requirement not

14  met where individualized issues were necessary to analyze plaintiff's off-the-clock claims).

### B.    Class Treatment Is Not A Superior Method Of Resolving This Controversy

16    "If each class member has to litigate numerous and substantial separate issues to establish

17  his or her right to recover individually, a class action is not 'superior.'"  *Zinser*, 253 F.3d at

18  1192.  Because neither liability nor damages turns on a common issue, resolution of Gardner's

19  putative class claims would entail separate trials for each class member.  Individual testimony,

20  for example, would be required from each employee who claims that GC Services' policies

21  "incentivized" off-the-clock work or that his or her manager manipulated timesheets.  *See*

22  *Washington*, 2010 WL 5396041, at *13-14 (superiority requirement not met where resolving

23  plaintiff's off-the-clock claims would require individualized inquiries); *Mateo*, 2009 WL

24  3561539, at *7 (same).  Nor is representative testimony an option, given the varying accounts

---

[82] Conley Dep. at 52:8-14, 54:1-12, 57:8-12, 85:5-14, 96:7-16, 100:15-18.

13117824v.3

1    between Gardner and other declarants.  Accordingly, there would be no judicial efficiency in

2    certifying her proposed class.

3    **IV.    Plaintiff Is Not Entitled To The Telephone Numbers And Social Security**
         **Numbers of GC Services' Current And Former Employees**

4

5            If the Court certifies a class, Gardner requests that the Court order GC Services to

     produce to plaintiff's counsel the name, address, phone number, and last four digits of the social

6    security number of each putative class member.  There is no reason for GC Services to disclose

7    phone numbers or social security information since any class notice would be effectuated by

8    mail.  More importantly, disclosure of this information would require GC Services to violate the

9    privacy rights of its current and former employees, and their privacy interests outweigh any

10   purported convenience with respect to a class notice.  *See, e.g.*, *Littlefield v. Dealer Warranty*

11   *Servs., LLC*, 679 F. Supp. 2d 1014, 1018 (E.D. Mo. 2010) (denying request for putative class

12   members' telephone numbers and social security numbers for purpose of class notice); *Delgado*

13   *v. Ortho-McNeil, Inc.*, No. 07-263, 2007 WL 2847238, at *3 (C.D. Cal. Aug. 7, 2007) (same).

14   The Court thus should deny Gardner's request for phone numbers and social security numbers.[83]

15                                   **CONCLUSION**

16           Based on the foregoing, GC Services respectfully requests that the Court deny Gardner's

17   motion for class certification.

18   DATED:  February 11, 2011                        SEYFARTH SHAW LLP

19

20

21                                                     By  s/ Arthur J. Rooney
                                                       Arthur J. Rooney
22                                                     Attorneys for Defendant
                                                       GC SERVICES, LP
23                                                     E-mail:  arooney@seyfarth.com

24

25

26   _____
     [83] It is premature to consider the other details of notice suggested by Gardner, such as the
27   timeframe for putative class members to opt out and any other deadlines.  These issues should
     only be addressed if the Court ultimately certifies a class.

28

13117824v.3

## <u>CERTIFICATE OF SERVICE</u>

Arthur J. Rooney, an attorney, hereby certifies that on February 11, 2011, he caused true and correct copies of the foregoing to be served via the Court's electronic filing system on the following attorneys of record in this matter:

Mark A. Potashnick
Ilya I. Ruvinskiy
WEINHAUS & POTASHNICK
11500 Olive Blvd., Suite 133
St. Louis, Missouri 63141

Richard M. Paul III
Ashlea G. Schwarz
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112

Jason Lindner
STUEVE SIEGEL HANSON LLP
550 West C Street, Suite 610
San Diego, California 92101

J. Farrest Taylor
Angela Mason
COCHRAN, CHERRY, GIVENS,
 SMITH, LANE AND TAYLOR
163 West Main Street
Dothan, Alabama 36301

G. Patrick Jacobs
JACOBS LAW OFFICE
7020 MacCorkle Avenue, SE
Charleston, West Virginia 25304

 s/ Arthur J. Rooney

13117824v.3